ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| ECC International Constructors, LLC | ) | ASBCA No. 59586 |
| | ) | |
| Under Contract No. W912ER-10-C-0054 | ) | |

APPEARANCES FOR THE APPELLANT:     R. Dale Holmes, Esq.
                                                          Michael H. Payne, Esq.
                                                           Cohen Seglias Pallas Greenhall & Furman PC
                                                           Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                           Engineer Chief Trial Attorney
                                                           Martin Chu, Esq.
                                                             Katherine M. Smith, Esq.
                                                           Engineer Trial Attorneys
                                                           U.S. Army Engineer District, Middle East
                                                           Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

In this appeal concerning a contract to design and construct a 20-building military compound in Afghanistan, appellant, ECCI International, Inc. (ECCI), alleges government-caused project delay and other matters, and requests $9,035,587 and the return of 400 days of withheld liquidated damages.[1]  In 2020, the Board conducted a two-week hearing of this and a companion appeal, ASBCA No. 59643.  Although the parties have briefed the two appeals together, ASBCA No. 59643 will be the subject of a separate opinion.  We have previously issued opinions in and related to ASBCA Nos. 59586 and 59643, and assume familiarity with those opinions.

FINDINGS OF FACT

*1.  The Contract, Performance, and Design Review*

The contract was awarded on September 29, 2010, in the amount of $29,186,338, and called for ECCI to design and construct a 70,000 square meter compound whose primary facilities included a communications building.[2]  ECCI was

---

[1] App. br. at 116.
[2] R4, tab 5 at 2, 179 § 1.1.

to complete the work within 548 days of receipt of the notice to proceed.[3]  After modifications, the revised contract completion date was March 13, 2013.[4]

The contract is of the "design-build" type.[5]  Section 3.9 of the contract provides that ECCI's design submittals were required to be submitted for government approval at the "Preliminary (65%), Final (95%), and at the Cleared for Construction (100%) stage[s]."[6]  Section 3.9.2, "Final Design Review Submittal (95%)," provides that "[t]he review of this submittal is to insure that the design is in accordance with directions provided the Contractor during the design process," and that "[t]he only effort remaining between the FINAL DESIGN REVIEW SUBMITTTAL and the 'CLEARED FOR CONSTRUCTION' DESIGN REVIEW SUBMITTAL is the incorporation of the Government Review Comments."[7]

The government approved ECCI's 95% design on August 23, 2011, providing 56 comments on the communications design, one of the ten components of ECCI's proposed design.[8]  ECCI submitted its 100% design on November 19, 2011, incorporating those comments.[9]  Most of the project's buildings were cleared for construction in December 2011.[10]  However, on December 16, 2011, the government disapproved the 100% design, providing 226 new comments on the communications design.[11]  The government would require ECCI to submit the 100% communications design for review no fewer than three more times before approving it.[12]

On November 16, 2012, nearly a year after ECCI submitted its 100% communications design, Robert C. Vanoer, Jr., the government's resident engineer and contracting officer's representative (COR), wrote to ECCI that "[t]he lack of an approved communications design is causing delays to the project."[13]  At the hearing of

---

[3] R4, tab 5 at 39.

[4] *See* gov't br. at 3; app. reply at 4.

[5] *See* R4, tab 5 at 179 ¶ 1.1.

[6] R4, tab 5 at 250.

[7] R4, tab 5 at 251 (capitalization in original).

[8] R4, tab 742; app. supp. R4, tab 471; tr. 8/97-98; *see* app. br. at 4 ¶ 23; 32; gov't br. at 18.

[9] R4, tab 201; *see* app. br. at 6 ¶ 29; gov't br. at 18-19.

[10] Tr. 1/36.

[11] R4, tab 878; tr. 8/97-98; app. br. at 7 ¶ 35; *see* gov't br. at 16 ¶ 17.

[12] *See* app. br. at 9 ¶ 46; gov't br. at 21 (chart).

[13] R4, tab 367; tr. 6/87-88.

the appeal, Mr. Vanoer stood by that position.[14]  Mr. Vanoer also testified that he agreed, at the time, with an assessment expressed in a November 2012 government information paper that "the contract has had significant delays due to," not only "contractor inefficiencies," but "design changes" and (in what we take to be a reference to the government) "user requested changes."[15]  Mr. Vanoer provided further testimony indicating that a statement in a January 2013 government email chain that "getting  the contractor to comply with our comms and HVAC design review comments will cause an eight-month delay" to the project was consistent with his own, contemporaneous understanding.[16]

In addition, on December 6, 2012, the government's Administrative Contracting Officer (ACO) John Long wrote to ECCI that:

> As a result of the ECC's [sic] failure to date to submit a proper Communication System Design, I consider this a contractor caused delay, and the Government is not liable for any indirect cost(s) for the entire period, including the time to complete the design, submit the design for approval, complete installation, testing and obtain the Government's acceptance of the Communication System.
>
> . . .
>
> To mitigate your costs, reduce your delay, and complete this important project, the Government is prepared to meet weekly (via teleconference) to assist your subcontractor.[17]

Mr. Long did not testify at the 2020 hearing of this appeal.

The government finally approved ECCI's 100% communications design on March 14, 2013, 454 days after initially disapproving that design on December 16,

---

[14] Tr. 6/86-89.  Mr. Vanoer also agreed that he had "authority to make official responses to the contractor, request changes for the project, and direct contractor's [sic] activities."  Tr. 6/123-24 (concerning app. supp. R4, tab 111).

[15] Tr. 6/107-09 (concerning app. supp. R4, tab 755).

[16] *See* tr. 6/110-11 (concerning app. supp. R4, tab 168 at 1).

[17] R4, tab 384 at 1.

2011.[18]  ECCI substantially completed the project on April 19, 2014,[19] 402 days after the March 13, 2013, revised completion date.

## 2.  *The Entry Control Point Security Changes*

The contract provides that the compound to be constructed would be sited on a dedicated area located outside the perimeter fencing of an existing military base.[20]  In 2012, an International Security Assistance Force completed "an expansion of the base security fence that encompassed the contract work site, and . . . exercised its authority to establish, monitor, and enforce all of the security procedures at the worksite."  *ECC Int'l Constructors, LLC (ECCI)*, ASBCA No. 59138 *et al.*, 19-1 BCA ¶ 37,252 at 18,314; *aff'd sub nom. ECC Int'l Constructors, LLC (ECCI) v. Sec'y of the Army*, 817 F. App'x 952 (Fed. Cir. 2020) (table).

## 3.  *The Claims and Resulting Appeals*

### a.  *ASBCA No. 59138:  the appeal from the contracting officer's decision upon the October 8, 2013 claim*

On October 8, 2013, ECCI presented to the contracting officer a claim for $807,987.56 and 19 days of delay that ECCI said were the result of changes in security requirements at the site; specifically, ECCI pointed to "changes to the site that were made after Contract award, that changed [the] project from 'outside the wire' to 'inside the wire.'"[21]  ECCI explained that the costs and delays at issue "start[ed] on April 7, 2012, and [were] continuing" through at least October 7, 2013, the date of the certification of the claim.[22]  On January 18, 2014, the contracting officer issued a final decision upon that claim, granting an extension of time of 19 calendar days, and denying the remainder of the claim.[23]  ECCI appealed from that decision on January 22, 2014.  The Board docketed that appeal as ASBCA No. 59138.  In its February 13, 2014 complaint in ASBCA No. 59138, ECCI alleged that:

> [a]s a direct result of the changed security requirements, ECCI suffered 19 calendar days of delays to performance

---

[18] App. supp. R4, tab 177; *see* ex. 2 (demonstrative).

[19] Gov't br. at 3 ¶¶ 12-13; app. reply at 4.

[20] R4, tab 5 at 179 § 1.2.

[21] R4, tab 70 at 1, 5.

[22] *See* R4, tab 70 at 3, 5-6.

[23] *See* R4, tab 2 at 1, 12.

4

of the work from early April 2012 through the end of July 2012.[24]

ECCI requested $806,732.10, "19 calendar days of time extension," and a "finding that the change of site access and security requirements was a compensable change under the Changes Clause . . . ."[25]

### b. February 12, 2014 Claim

On February 12, 2014, ECCI presented a claim (Letter H-155) to the contracting officer, requesting $13,519,913.91 and 329 days of delay for (1) "[c]hanges directed by the Government to address security requirements for the contract"; (2) "[t]he 95% and 100% communications design submissions"; and (3) "[o]ther directives to perform additional work or to change the requirements of the contract."[26]  In that claim, ECCI represented that from May 15, 2012, through October 26, 2013, the project experienced 205 days of delay due to changes in the security posture of the work site (also known as changes to "entry control points" (ECPs)).[27]  More specifically, ECCI explained that from September 29, 2010, through October 26, 2013, "the project experienced 205 days of ECP [security changes] delays, and a total of 389 days of Design delays of which 205 days were concurrent to the ECP delays."[28]  ECCI relied upon the work of Lombardia Consultants for that delay analysis.[29]  No one from Lombardia testified at the hearing of this appeal.

### c. Liquidated Damages

On April 9, 2014, an administrative contracting officer (not Mr. Long) assessed and withheld $940,273.98 in liquidated damages for 402 days of delay, at $2,338.99 per day.[30]  *ECCI Int'l Constructors, LLC (ECCI)*, ASBCA No. 59586, 22-1 BCA 38,131 at 185,228.  ECCI has not appealed from that assessment.

---

[24] ASBCA No. 59138 compl. at 7 ¶ 39.

[25] ASBCA No. 59138 compl. at 10.

[26] R4, tab 72 at 1.

[27] R4, tab 72 at 59-61, 65.  Despite such assertions, ECCI says that "[s]ecurity was never claimed as a delay issue."  App. br. at 61; *see also* app. reply at 4, 15, 44. Nor does ECCI currently say that the ECP security changes constitute an excusable delay entitling it to remission of liquidated damages.  *See* app. br. at 26 ¶ 127; reply at 4.

[28] R4, tab 72 at 65-66.

[29] *See* tr. 1/241; R4, tab 72 at 273, 333, 608; app. br. at 61.

[30] Gov't br. at 33; R4, tab 816 at 2.

d. *ASBCA No. 59586:  the pending appeal from the deemed denial of the February 12, 2014 claim*

On September 18, 2014, ECCI noticed to the Board its appeal from what ECCI evidently mischaracterized as the deemed denial of its "May 2, 2014" claim.  ECCI further explained that its "May 2, 2014" claim "was in the amount of '$13,519,913.01 and 329 calendar days of delay.'"  Despite its references to "May 2, 2014," we understand ECCI's September 18, 2014 notice to appeal from the deemed denial of its February 12, 2014 claim (Letter H-155) for $13,519,913.91 and 329 days of delay.

The Board docketed ECCI's September 18, 2014 appeal as ASBCA No. 59586. On October 23, 2014, ECCI filed a three-count complaint in ASBCA No. 59586. Count I of the complaint alleges that "[a]s a direct result of the changed security requirements" at the work site, "ECCI suffered significant delays to performance of the work from early April 2012 through the end of the project."[31]  Count II alleges government delays in reviewing "ECCI's 95%, 100%, and 100% redesign submittals," as well as the government's "directives to perform additional work."[32]  Count III alleges that the government directed ECCI to perform several specified items of allegedly extra-contractual work.[33]  Count III further alleges that:

> [a]s a direct result of all of the directed changes included in Count III, ECCI incurred critical delays to completion of the project; the delay costs associated with the directed changes are included in this claim, while the actual increase in design, procurement, shipping and construction costs are included in ECCI's separate May 2, 2014 Certified Claim."[34]

In its prayer for relief, ECCI again requested $13,519,913.91 and 329 days of delay.[35]

---

[31] ASBCA No. 59586 compl. at 7 ¶ 39.

[32] ASBCA No. 59586 compl. at 10.

[33] ASBCA No. 59586 compl. at 27-38 ¶¶ 156-229.  Count III of the complaint in ASBCA No. 59586 includes allegations of government-directed changes that are not addressed in ECCI's briefing of ASBCA No. 59586.  To the extent those allegations appear in ECCI's briefing of ASBCA No. 59643, we reserve them for decision in ASBCA No. 59643; otherwise, they are waived.  *See Bannum, Inc. v. United States*, 779 F.3d 1376, 1382 (Fed. Cir. 2015).

[34] ASBCA No. 59586 compl. at 38 ¶ 228.

[35] ASBCA No. 59586 compl. at 38.

*e. ASBCA No. 59643: the pending appeal from the deemed denial of the*
*May 2, 2014 claim*

On May 2, 2014, ECCI presented a claim (Letter H-158) to the contracting officer, requesting "$3,767,856.32 for the cost impacts" that ECCI claimed were "directly attributable to the extra work caused and directed by the Government during execution of the project."[36]  On October 24, 2014, ECCI noticed its appeal from the deemed denial of that claim, and filed a complaint requesting $3,767,856.32, and that the Board find that the government "caused additional costs through its handling of the design review process" and "directed performance of changed work."[37]  The Board docketed the appeal as ASBCA No. 59643.

*f. ASBCA No. 60284: the dismissed appeal from the deemed denial of the*
*August 11, 2015 claim*

On August 11, 2015, ECCI presented to the contracting officer a claim for $227,987, alleging "directed changes that occurred during the design and construction of this project."[38]  On October 14, 2015, ECCI noticed its appeal from what it characterized as the deemed denial of that claim.  The Board docketed that appeal as ASBCA No. 60284.  In its October 31, 2015 complaint in that appeal, ECCI requested $227,986.54, including for "accelerated and phased turnover."[39]  In a pre-hearing brief filed in ASBCA Nos. 59138, 59586, 59643, and 60284 on February 7, 2020, in which ECCI requested $13,698,255.40, ECCI again requested $227,986.54 of that amount based upon the allegation that the government had directed ECCI "to turnover [sic] buildings in a phased completion."[40]  On February 21, 2020, ECCI requested dismissal of ASBCA No. 60284 with prejudice.  The Board dismissed ASBCA No. 60284 with prejudice on February 24, 2020.[41]

---

[36] R4, tab 75 at 1, 6.

[37] ASBCA No. 59643 compl. at 14.

[38] October 14, 2015, notice of appeal.

[39] ASBCA No. 60284 compl. at 5.  We understand the terms "phased turnover" and "phased handover" to be synonymous.

[40] App. prehearing br. at 24-26.

[41] During the hearing, ECCI's counsel confirmed that although the claim for acceleration damages set forth in ASBCA No. 60284 was no longer before the Board, the "acceleration claim in the delay claim" (presumably set forth in ASBCA No. 59586), and its associated alleged damages, were still before the Board.  Tr. 9/49-50.

### g. Summary Judgment

On January 24, 2019, in ASBCA Nos. 59138 and 59586, the Board ruled upon the parties' cross-motions for partial summary judgment upon the question, referring to the ECP security changes, "whether, when a third party controlling a military base interfered with access to a compound that the government contracted appellant to build outside the base, an express contract warranty was breached, entitling appellant to recover for a constructive change to the contract." *ECCI*, 19-1 BCA ¶ 37,252 at 181,314. The Board denied ECCI's motion for summary judgment and granted the government's request for partial summary judgment that "[t]he change to the security posture of the . . . Compound was not a constructive change to the Contract for which [ECCI] is entitled to Compensation." *Id.* at 181,314-15. Specifically, the Board granted the government's cross-motion for partial summary judgment "on the issue of entitlement with regard to ASBCA No. 59183 and Count I of ASBCA No. 59586 . . . to the extent set forth" in the Board's decision. *Id.* at 181,315. On June 5, 2020, the United States Court of Appeals for the Federal Circuit affirmed the Board's opinion, explaining that the government was not liable for increased costs caused by the changes in the security posture of the project. *ECCI*, 817 F. App'x at 953.

### h. Expert Delay Report of William Schwartzkopf

On January 3, 2020, nearly a year after the Board ruled that the ECP security changes at the worksite were not compensable, a delay expert, William Schwartzkopf, of Sage Consulting, issued a report in support of ECCI's delay claims.[42] Mr. Schwartzkopf opined that crediting for time extensions, the project experienced three periods of compensable critical path delay totaling 420 days: (1) 290 days from March 23, 2012 through March 14, 2013, for the communications redesign; (2) 53 days from May 28, 2013, through September 15, 2013, for "[a]dded communications outlets," and (3) 77 days from November 5, 2013, through February 28, 2014, for "dedicated electrical panels in communication rooms."[43] Mr. Schwartzkopf explained that, in arriving at that conclusion, he modeled "[t]wenty-two impact events—including both potential ECCI-caused delays and potential Government-caused delays . . . with [Time Impact Analysis (TIA)] schedules to determine what, if any, impact these issues had on Project Completion."[44] And in an undated supplemental "concurrency analysis" to his expert report, presumably completed after the date of the expert report itself but no later than February 24, 2020

---

[42] App. supp. R4, tab 1251; tr. 3/48, 91, 102.
[43] App. supp. R4, tab 1251 at 35-36.
[44] App. supp. R4, tab 1251 at 32.

8

(when the hearing of these appeals began), Mr. Schwartzkopf explained, referring to his 22-item set of potential project delay events, that:

> For each of the following impact events, which include potential [government]-caused delays and known potential contractor-caused delays, *a fragnet—a fragmentary network*, which is a sequence of linked activities—*was built to represent the development and resolution of the issue*[.][45]

A "fragnet" is "a sequence of new activities and/or activity revisions, logical relationships, and resource changes added to an existing schedule to demonstrate the influence of a new activity on the schedule." *Nassar Grp. Int'l N.G.I. S.A.L. (Offshore) R.C., Doing Bus. As NGI Afghanistan for Contracting*, ASBCA No. 58451 *et al.*, 22-1 BCA ¶ 38,206 at 185,549 n.15.

The government at least implies that Mr. Schwartzkopf's opinion is not credible, noting that absent from the 22 items for which Mr. Schwartzkopf created fragnets are the ECP security changes that—prior to our 2019 opinion denying ECCI's summary judgment motion and granting the government's summary judgment motion upon the ECP security changes—ECCI represented had delayed the work from early April 2012, through the end of the project.[46] Indeed, Mr. Schwartzkopf did not subject the ECP security changes to the type of analysis to which he subjected the other 22 items, as his testimony on cross-examination makes clear:

> Q.    Do you have a fragnet for the entry control point delay?
>
> A.    I do not.[47]

Although Mr. Schwartzkopf was aware that ECCI had, in its February 12, 2014 claim, asserted that the security change had delayed the project,[48] he testified in a remarkably conclusory fashion that "[t]here was no point in modeling [the ECP security changes]

---

[45] Ex. 6 at 2 (emphasis added).
[46] Gov't br. at 29; ASBCA No. 59586 compl. at 7 ¶ 39.
[47] Tr. 2/275-76.
[48] Tr. 2/273-74.

because it couldn't have delayed design."[49]  When asked whether his analysis considered "all of the delay events that impacted the project," he answered:

> There were several others that, just looking at them, it was apparent that they did not cause a critical delay, *or the security change*, where we looked at when it happened, and the construction was on the critical path.[50]

And although Mr. Schwartzkopf characterized the security change as insignificant, he simultaneously testified that he listed the security change in his expert report as one of several "*known significant delays*" that were "not incorporated in [his] model."[51]

Despite the testimony indicating that he "looked" at the ECP security changes,[52] ECCI says that Mr. Schwartzkopf's delay report "analyzes all potentially significant delays on the project to establish the critical path delays."[53]  ECCI also says that "[Mr.] Schwartzkopf testified that he analyzed all delays on the project."[54]  Neither is the case.  Mr. Schwartzkopf did not analyze all the potential delay issues on the project; nor did he testify that he did:  specifically, Mr. Schwartzkopf did not analyze the ECP security changes, at least not in the manner that, as ECCI recites in its initial post-hearing brief, he analyzed the 100% communications design issue, the communications outlets issue, and the dedicated electrical panels issue.  That is, Mr. Schwartzkopf did not make the ECP security changes the subject of a fragnet.[55]  Again, although he was aware of the ECP security change issue when he issued his expert report, in order "to evaluate whether the ECP delays may have caused a critical path delay," Mr. Schwartzkopf only "looked" at the ECP security changes;[56] he did not subject that issue to the fragnet-based analysis to which he subjected 22 other potential delay issues, evidently deliberately.

Indeed, one only has to refer to page 61 of ECCI's initial post-hearing brief to see the difference in the analyses performed by Mr. Schwartzkopf (and advanced by ECCI).  Regarding the dedicated electrical panels issue, ECCI says that Mr. Schwartzkopf "analyzed this delay using a fragnet," whereas, regarding the ECP

---

[49] Tr. 2/254-55.
[50] Tr. 2/254 (emphasis added).
[51] Tr. 7/214 (alteration added).
[52] *See also* tr. 3/55-56.
[53] App. br. at 43.
[54] App. br. at 52; *see* app. reply at 4.
[55] App. br. at 57-62.
[56] *See* app. supp. R4, tab 1251 at 21, 137-38.

security changes, ECCI says that Mr. Schwartzkopf "analyzed the security change,"[57] avoiding any reference to a fragnet, as ECCI must when discussing Mr. Schwartzkopf and the ECP security changes, because Mr. Schwartzkopf did not "use a fragnet" to analyze the ECP security changes.

ECCI says that "anyone looking at [the project] would see that security was never the driving delay," and that "the original analysis in ECCI's claim showed delays other than security were longer."[58]  We understand this to be not only a nod to Mr. Schwartzkopf's statement that he "looked" at the ECP security changes[59] (which we take to mean that Mr. Schwartzkopf looked at what Lombardia had said about it), but also a reference to Lombardia's report, which we understand was a basis for ECCI's February 12, 2014 claim to the contracting officer.[60]  Leaving aside for the moment what Lombardia concluded—particularly because no one from Lombardia ever testified in this appeal—if that is what ECCI means by delay analysis, we find it no analysis at all.

What's more, Mr. Schwartzkopf failed to create a fragnet for the ECP security change issue even though he agreed that there was contemporaneous evidence in ECCI's project records that reflected that workers were delayed in getting through the entry control points.[61]  Indeed, Roger Khoury, the managing partner of Sabaton Salim Construction Company (SSCC), a subcontractor to ECCI on the project, testified by sworn declaration dated February 3, 2020, that "[t]he inefficient process of getting workers through the base security ECP never got better from the time it was implemented on June 1, 2012, *until the project was completed*."[62]  Mr. Khoury further testified that "[a]s a direct result of the changes in security process for access to the project site, SSCC incurred additional [costs] of 3 types *over the 130 days of Government caused delays*, within the period February 2013 to November 2013."[63]

Mr. Khoury's account is corroborated by Ajmal Imtiaz, the president of another ECCI subcontractor at the worksite—IMTIAZ Group Construction (IGC)—whose February 4, 2020 sworn declaration states—in language virtually identical to Mr. Khoury's—that "[t]he inefficient process of getting workers through the base security ECP never got better from the time it started on June 1, 2012, *until the project*

---

[57] App. br. at 61-62.

[58] App. br. at 62.

[59] *See* tr. 2/254.

[60] *See* R4, tab 72 at 273, 333, 608; tr. 1/241-45; app. br. at 61.

[61] *See* tr. 2/272.

[62] Ex. 12 at 1, 5-6, 17 (emphasis added).

[63] Ex. 12 at 9 (emphasis added).

*was completed*," and that "[a]s a direct result of the security procedures, IGC incurred additional costs of 3 types *over the 130 days of Government caused delays*, within the period February 2013 to November 2013."[64] Indeed, Mr. Imtiaz agreed that "[t]he ECP delay caused more delay to [IGC's] work on the project than the refinishing after communications installation,"[65] at least suggesting that the ECP security changes outlasted the 100% communications design issue as a delay event. And of course, ECCI admits in its complaint in this appeal that ECP security changes delayed the project from "April 2012, *through the end of the project*."[66] Because Mr. Schwartzkopf omitted the ECP security changes from the fragnet-based delay analysis to which he subjected 22 other potential delay issues, we find his delay opinion not credible, and reject it.

## DECISION

In its initial, post-hearing brief in ASBCA No. 59586, ECCI sets forth the following claims: (1) "improper design review of ECCI's 95% design submittal;"[67] (2) 420 days of compensable and excusable project delay due to (a) the government's allegedly improper review of ECCI's 100% communications design (290 days), (b) a government-directed increase in the quantity of communication outlets (53 days), and (c) a government-directed requirement to provide dedicated electrical panels in communications rooms (77 days);[68] (3) apparently in support of that improper review claim, a breach of the implied duty of good faith and fair dealing;[69] (4) that the government failed to reimburse ECCI for all of ECCI's Defense Base Act (DBA) payments;[70] and (5) that the government constructively accelerated the project schedule.[71]

---

[64] Ex. 13 at 1, 5, 6-7, 15 (emphasis added).

[65] Tr. 4/43, 62.

[66] ASBCA No. 59586 compl. at 7 ¶ 39 (emphasis added).

[67] ASBCA No. 59586 compl. at 26-27 ¶ 155.

[68] App. br. at 1, 20, 23, 57-62, 110-11. Regarding delay periods and liquidated damages, ECCI variously references 400 days, 402 days, and 420 days. App. br. at 62, 111, 116; app. reply at 4, 44. Although the three components of ECCI's delay claim total 420 days, app. br. at 26 ¶ 127, ECCI seeks $940,274 in withheld liquidated damages (app. br. at 110; reply at 4), which at 2,338.99 per day equates to 402 days; that $940,274 is equivalent to the $940,273.98 (unrounded) that the government assessed and withheld.

[69] App. br. at 14.

[70] App. br. at 29-30.

[71] App. br. at 19 ¶¶ 81, 86-87; *see* gov't br. at 42 ¶ 48 (citing R4, tab 72).

*I. Review of 95% Design Submittal*

In its complaint in ASBCA No. 59586, ECCI presents a claim for recovery related to the alleged "improper design review of ECCI's 95% design submittal."[72] Because we find in ECCI's post-hearing briefing no separate claim for "improper design review of ECCI's 95% design submittal," that claim is waived or abandoned.[73] *See Bannum*, 779 F.3d at 1382; *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58-59 (2021).

*II. Delay Claims*

*A. Jurisdiction*

Again, in ASBCA No. 59586, ECCI claims 420 days of compensable and excusable project delay due to (a) the government's allegedly improper review of ECCI's 100% communications design (290 days), (b) a government-directed increase in the quantity of communication outlets (53 days), and (c) a government-directed requirement to provide dedicated electrical panels in communications rooms (77 days). The government challenges whether those claims have been presented to the contracting officer.[74] For the Board to possess jurisdiction to entertain a claim, the claim must first have been presented to a contracting officer. *CDM Constructors, Inc.*, ASBCA No. 59524, 15-1 BCA ¶ 36,097 at 176,238. ECCI's February 12, 2014 claim to the contracting officer claims project delay allegedly caused by (1) the government's 100% design review,[75] (2) government direction to increase the quantity

---

[72] ASBCA No. 59586 compl. at 26-27 ¶ 155.

[73] The government challenges other items that ECCI asserted in a spreadsheet presented during the hearing (1) an "unpaid balance," (2) claim preparation costs, and (3) bond costs (app. reply at 43). (Gov't br. at 40, 45-46; app. supp. R4, tab 305; tr. 1/290). ECCI does not assert those three claims in its initial post-hearing brief, although two of those claims (claim preparation costs and bond costs) are referenced in ECCI's reply brief. App. reply at 21, 43. Those items are waived. *See Bannum*, 779 F.3d at 1382.

[74] Gov't br. at 4.

[75] R4, tab 72 at 8.

of electrical outlets,[76] and (3) government direction to provide dedicated electrical panels.[77]  Consequently, we possess jurisdiction to entertain those claims.[78]

With respect to liquidated damages, the contract provides that "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $2,338.99 for each calendar day of delay until the work is completed or accepted."[79] Both parties claim entitlement to some $940,274 in liquidated damages.[80]  On April 9, 2014, the government assessed and withheld $940,273.98 in liquidated damages for 402 days of delayed completion, at the contract rate of $2,338.99 per day.[81]  *ECCI*, 22-1 BCA ¶ 38,131 at 185,228.  That assessment is a government claim.  *Parsons Evergreene, L.L.C.*, ASBCA No. 57794, 12-2 BCA ¶ 35,092 at 172,347; *K-Con Bldg. Sys., Inc. v. United States*, 107 Fed. Cl. 571, 587 (2012).

### B.  Mr. Schwartzkopf's expert delay opinion is not credible

For ECCI to recover for a compensable delay, it "must prove that the government was the sole cause of the delay and that the appellant did not contribute to or concurrently cause such delay." *Insulation Specialties, Inc.*, ASBCA No. 52090, 03-2 BCA ¶ 32,361 at 160,101.  Additionally, ECCI "'must show that the government's actions affected activities on the critical path of [ECCI's] performance of the contract.'" *O-Tech Sols., LLC*, ASBCA Nos. 61898, 62095, 23-1 BCA ¶ 38,338 at 186,169.  To establish entitlement to an extension based on excusable delay, ECCI must show that the delay resulted from unforeseeable causes beyond the control and without the fault or negligence of ECCI, and that the unforeseeable cause delayed the overall contract completion; that is, the delay must have affected the critical path of performance.  *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000).

To demonstrate that the government delayed project performance, ECCI relies primarily upon the opinion of Mr. Schwartzkopf.  To be credible, a contractor's delay

---

[76] R4, tab 72 at 29-31.

[77] R4, tab 72 at 49-50.

[78] In *ECC Int'l Constructors, LLC*, ASBCA No. 59586, 24-1 BCA ¶ 38,489 at 187,083-84, we denied the government's motion that we dismiss certain claims, for lack of jurisdiction, for failure to state sums certain.

[79] R4, tab 5 at 39 ¶ 52.211-12(a) (FAR 52.211-12(a), LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000)).

[80] *See* app. br. at 110-11, 116; gov't br. at 2-3, 40, 120; app. reply at 4.

[81] Gov't br. at 3; FAR 52.211-12(a), LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000) (R4, tab 5 at 39).

analyst must take into account, and give appropriate credit for, all of the delays that were alleged to have occurred. *See Gulf Contracting, Inc.*, ASBCA No. 30195, 89-2 BCA ¶ 21,812 at 109,759; *aff'd*, 23 Cl. Ct. 525 (1991); *aff'd per curiam*, 972 F.2d 1353 (Fed. Cir.) (table) (June 5, 1992); *see also Pathman Constr. Co.*, ASBCA No. 23392, 85-2 BCA ¶ 18,096 at 90,837, 90,846-47 (rejecting delay analysis with "built-in bias"). We have found that Mr. Schwartzkopf deliberately omitted from the crux of his delay analysis the ECP security changes that—until we ruled against ECCI upon that issue—ECCI had alleged delayed its performance. That is, Mr. Schwartzkopf did not make the ECP security changes the subject of a fragnet, as he did 22 other potential delay events. That renders Mr. Schwartzkopf's opinion not credible, and therefore, not helpful to us or to ECCI's case. *Cf. Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598, 669-70 (2010) ("Cross-examination assaulted [plaintiff's delay expert's] inclusion of all concrete activity on plaintiffs' as-built critical path—which extends through the construction of the floating guidewalls—at the expense of omitting the installation of the Project's control systems in the control tower"); *E. Minerals Int'l Inc. v. United States*, 39 Fed. Cl. 621, 627 (1997) ("The testimony and conclusions of one expert clearly were designed to mesh with the Government's legal theories. His refusal to acknowledge input from counsel in reaching his conclusions were not credible."), *judgment rev'd on other grounds*, *appeal dismissed sub nom., Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir. 2001); *Mega Constr. Co. Inc., v. United States*, 29 Fed. Cl. 396, 434 (1993) (discerning "a strong partisan position by [expert] in favor of plaintiff, in conflict with one of his duties as an expert witness to objectively assist the court to understand the facts and issue"). "We are free to reject expert testimony [that] we find intrinsically unpersuasive," *Reflectone, Inc.*, 98-2 BCA ¶ 29,869 at 147,829, and here, we find Mr. Schwartzkopf's opinion intrinsically unpersuasive.

Indeed, what Mr. Schwarztkopf did conflicts with what ECCI's counsel forecast on the first day of the hearing of this appeal. Counsel offered the following explanation of how delay experts conduct a "time impact analysis" (TIA) of the type that Mr. Schwartzkopf performed, pointing out the importance of making potential delay events the subject of fragnets in order to determine what delayed a project's critical path:

> [T]hey chop the project into different sections of time based on the delay events, and then they do the time-impact analysis doing the fragnets . . . .
>
> Or maybe new delay items came into the picture and the expert has to use his professional judgment to say well there's some new delay issues that are starting, so I

15

> need to start a new window and then I need to do a new impact window for that analysis and new fragnets for those.
>
> . . .
>
> You need to do a time impact for each potential delaying issue . . . .
>
> But if you've not looked at all the other issues that are potentially delaying, like the contractor's issues or other government issues, then you're not going to know which one is actually the critical path delay.[82]

Even Mr. Schwartzkopf's testimony highlights, although in awkward phrasing, the importance of fragnets in delay analysis:

> Q: But if the 100 percent design was never on the critical path, how could it have become critical at all?
>
> A: Well, any activity can become critical if it's extended or pushed out. *When we put a fragnet in, the model that it will push out* [sic].[83]

And ECCI concisely describes how, in analyzing the alleged communications outlets delay, Mr. Schwartzkopf relied upon a fragnet:

> A fragnet was created and inserted, showing the increased outlets as a driving delay.[84]

Even judged by ECCI's own standard, then, by not making the ECP security issue the subject of a fragnet, Mr. Schwartzkopf cannot know—and so neither from his opinion can the Board know—whether the ECP security changes were a critical path delay. Moreover, Mr. Schwartzkopf failed to meet the standard that he used to

---

[82] Tr. 1/86-88.
[83] Tr. 3/67-68 (emphasis added).
[84] App. br. at 60. ECCI apparently uses the term "driving delay" to refer to the concept of critical path delay. *See, e.g.*, app. br. at 25, 56 n.10.

criticize the government's delay expert for allegedly "dropp[ing] the design issue as a factor" for consideration:

> But that's one of the flaws when you do an as-built versus and-planned, is the scheduler can make judgments about what he wants to analyze. They chose not to analyze it, and it's a huge issue on this case and on this project.[85]

In response to what it says is the charge that "ECCI has changed its delay claim from the security issue to the communications re-design," ECCI counters that "[s]ecurity was never claimed as a delay issue; design delays and directed extra work were always the primary delay claim."[86] In support, ECCI quotes the testimony of ECCI Senior Program Manager, Scott Hayward, referring to Lombardia:[87]

> Well, at the very beginning prior to getting Lombardia, you know, [ECCI]'s own internal analysis of the first few months basically found that security wasn't the driving delay. Lombardia's analysis found the same thing.[88]

ECCI's reliance on that quote is a weak and ineffective explanation of Mr. Schwartzkopf's omission of the ECP security changes from the set of nearly two dozen items for which he created fragnets. First, Lombardia created fragnets for the ECP security changes, and its delay report is replete with references to those fragnets.[89] Indeed, of Lombardia's analysis, which was completed no later than the submission of the February 12, 2014 ECCI claim in which that analysis is incorporated,[90] ECCI explained in that claim that:

> For each change and/or delay issue that is discussed as part of [the February 12, 2014 claim], a Fragmentary Network (fragnet) was created demonstrating how the work was incorporated into the project schedule.[91]

---

[85] Tr. 1/38.
[86] App. br. at 61.
[87] *Id.*; ex. 1 at 1; *see* tr. 1/241.
[88] App. br. at 61 (quoting tr. 1/245).
[89] *See generally* R4, tab 72 at 72-103.
[90] R4, tab 72 at 72-103.
[91] R4, tab 72 at 64.

17

Second, in its February 12, 2014 claim, ECCI identified the "two categories" of schedule impacts "that run in parallel tracks to each other as they affected the project progress"; namely, "the 'ECP Impacts,'" and "'Design Delays and Additional Work Directive Impacts' (Design Delays),"[92] at least suggesting that both events were on the project's critical path.

Third, as the government points out,[93] Lombardia—unlike Mr. Schwartzkopf—actually analyzed the ECP security changes in relation to the design delay, as the following example illustrates:

> Figure 21 below indicates that during this period, the project experienced 42 days of Design delay, and 18 days of ECP delay. These two type [sic] of delays were occurring concurrent to each other. When this concurrency is recognized, the critical Design Delays for this period is quantified as 24 days (42 days of Design Delay – 18 days of ECP Delay).[94]

Aside from not creating any fragnets for the ECP security changes, nowhere does Mr. Schwartzkopf provide the type or level of comparative analysis of that issue provided by Lombardia. Although in his expert report he references the ECP security changes and Lombardia's analysis, he performs no such analysis of his own, on the one hand disavowing any opinion upon the issue while on the other actually offering such an opinion (however half-hearted), but ultimately brushing aside the possibility that the ECP security changes could have delayed the project:

> I have no opinion regarding whether the ECP delays impacted production on the Project, *but to the extent that there was an impact, it was on construction work, not design*, which was the driving delay to Project completion until the design was approved in March 2013. Also, any impact from the security protocols was incorporated into the schedule via actual dates in the contemporaneous schedules used for the concurrency analysis.[95]

---

[92] R4, tab 72 at 64.

[93] Gov't br. at 29.

[94] R4, tab 72 at 86.

[95] App. supp. R4, tab 1251 at 137-38 (emphasis added).

18

Finally, Lombardia's opinion does not address project delays that post-date or continue beyond the February 12, 2014 claim into which that opinion is incorporated. But "a proper TIA [would assess] the project schedule from the [notice to proceed] to completion, and [would have] considered *all delays* and their impacts to the project activities." *See Nassar Grp.*, 22-1 BCA ¶ 38,206 at 185,552 (bracketed material and emphasis added). In its February 12, 2014 claim, ECCI provides an explanation that illustrates the limitations of Lombardia's analysis, and how that analysis may not be the last word on whether and how the ECP security changes might have affected the project even after Lombardia completed its work:

> The ECP Impacts started to affect the project schedule in May 2012, continued without interruption, *and are still affecting the project progress as of this writing*. Due to the continuous nature of this impact, the ECP Impact analysis was performed for each schedule reporting period starting with the CC15 schedule with the data date of 15 May 2012. *It should be noted that, even though the ECP Impacts were continuing to affect the project progress as of this writing, the analysis for this REA was performed through 26 October 2013.* The continuing bearings of the ECP Impacts after 26 October 2013, can be quantified starting with the 27 October 2013 progress schedule update.[96]

The implications of that qualification are that Lombardia's analysis cannot be relied upon to explain the progress of the work after October 26, 2013, and that the ECP security changes were at least a potential delay event as late as February 12, 2014, which, of course is nearly a year after the government finally approved the 100% communications design on March 14, 2013. Indeed, despite the suggestion in ECCI's February 12, 2014 claim that Lombardia's analysis is helpful only through October 26, 2013, a passage in that claim at least hints that the ECP security changes might have "driven" delay of the project after that date, and perhaps, as ECCI alleged in its complaint in this appeal, "through the end of the project":

> Delays Incurred After 10/26/13
>
> As of 10/27/13, per the schedule update CC71 with the data date of 10/27/13, the ACMILE0040 project completion milestone was projecting a 12/24/13

---

[96] R4, tab 72 at 64 (emphasis added).

> completion date. This completion date signifies a [sic] 58 days of remaining contract work as of 10/27/13. *To our knowledge, the ECP impacts continued to affect the production rates in the field after 10/26/13.* If the average 30% production loss rate of September and October 2013 would be applied to this remaining 58 days of work, the ECP delays would be accountable for another 18 days.
>
> . . .
>
> *This 18 days of additional delay, on top of the 301 days of delay quantified through 10/26/13, would adjust the Contract Completion Date as 1/7/2014.* There were additional "Design delays" impacts during this timeframe as well. These include the half of the Additional Communications Installation Work, Legrand Floor Boxes, Dedicated Communications Rooms Electrical Panels, and HVAC Start Up and Commissioning Expert Ban. *Conservatively estimating that these issues delayed the project critical path 10 days in addition to the continuing ECP 18 day delay results in an additional 28 day delay during the months of November 2013 through February 2014.*[97]

Moreover, the project was not substantially completed until April 19, 2014, some four months after Lombardia completed its delay analysis, and some two months after ECCI presented its February 12, 2014 claim to the contracting officer.

All of this is to say that there is evidently more to the ECP security changes than Mr. Schwartzkopf gave credit, and that in view of ECCI's loss (at least in its estimation, perhaps) upon the ECP security changes issue, Mr. Schwartzkopf decided *not* to analyze that issue as a potential project delay, and ECCI decided not to pursue it as such. Indeed, the government alludes to this, saying that "after receipt of the Board's [summary judgment] Opinion, ECCI realized that it had to eliminate its security delay claim in order to maximize its request for delay damages,"[98] and that Mr. Schwartzkopf "entirely failed to include fragnets showing delays caused by the change in security posture."[99] ECCI counters that "[a]t no time has [ECCI] asserted

---

[97] R4, tab 72 at 103 (emphasis added).
[98] Gov't br. at 26.
[99] Gov't br. at 29.

that security delays were the driving or critical delays on the [] project,"[100] but that misses, perhaps deliberately, the point that prior to our opinion regarding the ECP security changes, ECCI relied upon a delay opinion—Lombardia's—that created fragnets to analyze the potential delay effect upon the project of the ECP security changes, and that after our ECP security change opinion, ECCI abandoned Lombardia's opinion, and relied upon a new opinion—Mr. Schwarzkopf's—that created *no fragnets* for the ECP security changes. We determine that Mr. Schwarzkopf's opinion is fatally tainted by litigation bias in favor of ECCI. For all these reasons, we find not credible, and we reject, Mr. Schwartzkopf's delay opinion, as well as, with the exception set forth below, ECCI's delay claim itself.[101]

### C. The government admits that the 100% communications design issue delayed the project

Although Mr. Schwartzkopf's opinion is not credible, ECCI points out that the government, in the persons of COR Vanoer and ACO Long, communicated to ECCI by letter that the issues with the 100% communications design were delaying the project.[102] Mr. Vanoer, wrote his letter on November 16, 2012; Mr. Long on December 6, 2012.[103] The government says that "[t]he communications redesign was never shown to cause an actual delay to construction,"[104] but does not address the statements of Mr. Vanoer and Mr. Long.[105] We determine these are admissions against the government's interest that the delay in approving the

---

[100] App. reply at 15.

[101] The government's expert, Mark Doran, also did not assign a fragnet to the ECP security changes: Mr. Doran explained that because of our opinion upon summary judgment, his report "does not address any claims regarding alleged delays as a result of the relocated entry control point (ECP) and associated revised security procedures" (R4, tab 1168 at 5). As the government at least implies with respect to Mr. Shwartzkopf's opinion, Mr. Doran's decision not to analyze the ECP security changes renders his delay opinion also not credible.

[102] App. br. at 17 ¶ 74; app. reply at 11; R4, tabs 367, 384.

[103] R4, tabs 367, 384.

[104] Gov't br. at 39.

[105] The government does say, however, that "the contemporaneous documentation, created during performance of the Contract, is the most reliable source of fact for events occurring on the Project" (gov't sur-reply at 4). Along those lines, a November 1, 2012, government information paper states that the project "has had significant delays due to design changes" and "user requested changes" (which we take as a reference to government-requested changes), in addition to "contractor inefficiencies" (app. supp. R4, tab 755 at 3(b)(1); tr. 6/108-09).

21

100% communications design delayed project completion, such delay beginning no later than November 16, 2012.  Furthermore, we draw the reasonable inference that the delay was critical path delay, because we expect that Mr. Vanoer, and, particularly, Mr. Long, the contracting officer, would not have informed ECCI that the design delay was delaying the project—a position that neither has recanted or otherwise explained away—if that were not the case.[106]  *See generally Raytheon Co.*, ASBCA No. 57743 *et al.*, 16-1 BCA ¶ 36,335 at 177,147 (distinguishing between evidentiary admissions and judicial admissions); *cf. Reliable Contracting Grp. v. Dep't of Veterans Affairs*, 779  F.3d 1329, 1334-35 (Fed. Cir. 2015) (contractor's contemporaneous admissions were "probative evidence that generators did not comply with the contract" (citations omitted))*; ITT Gilfillan Div.*, ASBCA No. 37834, 92-1 BCA ¶ 24,490 at 122,227-28 (statement in Turkish Air Force report that radar was "operational but degraded" was admission against interest proving radar was capable of passing contractually-required operational test); *Milam Builders, Inc.*, ASBCA No. 29700, 85-1 BCA ¶ 17,709 at 88,376 ("Appellant has claimed $1,573 although its evidence did not establish this amount; accordingly, the amount estimated by the Government will be considered an admission against interest.  Appellant is therefore entitled to $1,542."); *Phillips Constr. Co.*, ASBCA No. 5831 *et al.*, 70-2 BCA ¶ 8,363 at 38,893 ("The testimony of 75 days delay was therefore in the nature of an admission against interest or at least in diminution of appellant's principal case."); *Larco-Indus. Painting Corp.*, ASBCA No. 14647 *et al.*, 73-2 BCA ¶ 10,073 at 47,325 ("In an admission against interest, Mr. Parks before his departure on 11 December 1969 from Fort Chaffee told Mr. Roberts that respondent had as much of a problem with personnel as did the contractor . . . [w]e accept his appraisal.").  We also find that the delay began on November 16, 2012, when the government first admitted that the lack of an approved communication design was causing delays to the project, and ended on March 14, 2013, when the government finally approved the 100% communications design:  a period of 119 days, fewer than the 290 days that ECCI seeks.[107]

---

[106] We have already found not credible the opinion of Mr. Doran.  We further conclude that with respect to whether the delay in approving the 100% communications design delayed project completion, that opinion is otherwise unhelpful. Mr. Doran opined that the 100% design delay ended on December 16, 2011, and that, "[t]herefore, [the] 100% Design Review did not delay the Project" (R4, tab 1168 at 49).  Even ACO Long stated that, as late as December 6, 2012, the communications design was delaying the project (R4, tab 384 at 1). Although Mr. Doran testified at the hearing, he did not address Mr. Long's statement.  Tr. 7/6-207.

[107] App. br. at 60; *see* tr. 8/115-16.

However, for purposes of determining compensable delay, we must also consider concurrent delay not attributable to the government; consequently, we take into account our opinion upon summary judgment, affirmed by the Court of Appeals, that the ECP security changes were not compensable, and that, prior to that opinion, ECCI admitted that from September 29, 2010, through October 26, 2013 (a period of 1,124 days), "the project experienced 205 days of ECP [security changes] delays, and a total of 389 days of Design delays *of which 205 days were concurrent to the ECP delays*."[108]  Because those 205 days of concurrent, non-government delay exceed what we determine are not 389 days but only 119 days of design delay, we determine that ECCI is not entitled to any compensable delay.

### D.  *Whether the 100% communications design delay is nevertheless excusable*

The question is whether despite failing to prove entitlement to compensable delay, ECCI is entitled to remission of liquidated damages because of excusable delay on the same facts.[109]  The contract includes (Federal Acquisition Regulation) FAR 52.249–10, DEFAULT (FIXED–PRICE CONSTRUCTION) (APR 1984), which provides, at (b)(1):  "[t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor."[110]  ECCI has the burden of establishing by a preponderance of the evidence the existence of any such excusable delay.[111]  *See Sauer*, 224 F.3d at 1347.  ECCI says that "the question is not whether [the government] was correct in [its] objections to ECCI's design, but rather, did [the government] act in a timely and reasonable manner."[112]  In apparent reliance upon section 3.9.2 of the contract,[113] ECCI says that it submitted its 100% communications design "under the reasonable belief that only the comments made to the 95% design required response, based on the Contract."[114]  In essence, ECCI argues that so long as its 100% "cleared for construction" design review submittal incorporated the "government review comments" generated by the government's review of the 95% "final design review submittal," section 3.9.2 required that its

---

[108] R4, tab 72 at 65-66 (emphasis added).

[109] App. br. at 110-11, app. reply at 4.

[110] R4, tab 5 at 105-06.

[111] Although ECCI does not express it as such, we regard its request for remission of liquidated damages as including by way of excusable delay.

[112] App. br. at 38.

[113] App. br. at 6 ¶ 31.

[114] App. br. at 66 ¶ 170.

100% communications design review submittal be approved, and cleared for construction.

We agree. Section 3.9.2 provides that "[t]he *only* effort remaining between the FINAL DESIGN REVIEW SUBMITTAL and the 'CLEARED FOR CONSTRUCTION' DESIGN REVIEW SUBMITTAL is the incorporation of the Government Review Comments."[115] That section does not contemplate or authorize months more of back-and-forth between the government and the contractor in which the government presents dozens if not hundreds of additional, new design comments that the contractor must analyze and respond to as a condition of approval of its 100% design, and clearance for construction. In response to ECCI's 95% design submission, the government made 56 comments, on the communications design.[116] When ECCI responded with a 100% communications design that incorporated those 56 comments, ECCI was entitled to the approval of that design, and clearance for construction. Instead, the government responded with 226 new comments,[117] triggering a delay period that we conclude is attributable to the government.

The government says:

> [section 3.9.2] is not relevant to the contractor's remaining effort after submission of the 100% [communications] design and upon receipt of the government's 100% [communications] design comments. The contractor's incorporation of the government's 95% design comments did not relieve ECCI of its responsibility to submit designs in strict conformance with the contract, nor prohibit the government from requiring correction to non-compliant design or construction during any phase of the contract.[118]

The government also cites section 3.7.1, which provides that "[t]he work under contract will be subject to continuous review by representatives of the Contracting Officer."[119] The government further cites section 3.7.4, "Government Review," which provides that:

---

[115] R4, tab 5 at 251 (capitalization in original, italicized emphasis added).

[116] R4, tab 742; tr. 8/97-98.

[117] Tr. 8/97-98.

[118] Gov't br. at 18-19 (emphasis omitted).

[119] Gov't br. at 69-70 ¶ 84 (citing R4, tab 5 at 247).

24

> The contractor shall not begin construction work until the Government has reviewed the contractor's design and has cleared it for construction. Clearance for construction does not mean Government approval.[120]

We agree that "clearance for construction" is not immunity from further government review. In addition to the sections that the government cites, section 1.2.1, "Design Submittals," provides that "[c]learance for construction shall not be construed as meaning Government approval," and that, "[u]nless otherwise indicated, the risk for the design is the *sole responsibility* of the Design-Build Contractor."[121] Nevertheless, the question here is whether ECCI, having incorporated the government's comments in response to it 95% design, was entitled to approval of its 100% communications design, and the clearance for construction that goes with it. (Indeed, section 3.8.5 of the contract, Commencement of Construction, provides that "[c]onstruction of work may begin after receipt of the clearance for construction (Notice to Proceed) *for each design phase*.)[122] The answer pursuant to section 3.9.2 of the contract is yes.[123] We will not speculate upon what would have been the case had the government timely approved the 100% communications design (as submitted on November 19, 2011), thus clearing that design for construction, and only thereafter interjected new comments raising issues with that design.[124]

If the answer were otherwise, section 3.9.2 would be merely aspirational; the position that the government expressly took during the hearing of these appeals, but notably does not assert in its post-hearing briefing.[125] We do not regard section 3.9.2 as aspirational; that provision is not "too amorphous to provide any basis to identify

---

[120] R4, tab 5 at 247-48; *see* gov't br. at 16.

[121] R4, tab 5 at 232 (emphasis added).

[122] R4, tab 5 at 250 (emphasis added).

[123] Contract interpretation aside, as a practical matter, as ECCI points out (app. reply at 32), the designer whom ECCI hired for the project testified that "[t]here is no reason why any of [the government's] substantive 100% design review comments should not have been given on the 95% design submittal." Ex. 11 at 2, 8. The government does not address that statement.

[124] ECCI invokes the duty of good faith and fair dealing in support of its section 3.9.2 argument (app. br. at 42-43). In view of our conclusion here, we need not address that issue. Consequently, the government's October 16, 2020 motion to exclude or strike that invocation, which the government repeats in its December 21, 2020 post-hearing sur-reply brief (gov't sur-reply at 29), is denied as moot.

[125] *See* tr. 4/108, 230; tr. 6/16.

concrete obligations." *Kellogg Brown & Root Servs., Inc.*, ASBCA Nos. 59385, 59744, 20-1 BCA ¶ 37,656 at 182,827. Rather, section 3.9.2 speaks in precise terms. *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 517 (1994) (rejecting contention that regulation's language was "precatory" or "aspirational," and "thus lacking in operative force" where it "speaks not in vague generalities but in precise terms").

For these reasons, we conclude that ECCI is entitled to an excusable delay of 119 days from November 16, 2012, thorough March 14, 2013, for the government having delayed the project by delaying the approval of the 100% communications design, at $2,338.99 per day, for a total of $278,339.81 in remitted liquidated damages. We have considered the government's other, related points on this issue,[126] and are not persuaded by them, including because many of those points relate to events occurring before Mr. Vanoer and Mr. Long made their statements in late 2012. The government also points to statements of ECCI in early 2014, regarding other potential delays that the government apparently attributes to ECCI, but does so without adequately, if at all, identifying the specific periods of such delay.[127] None of this changes our conclusion that ECCI is entitled to the remission of 119 days of liquidated damages for excusable delay. Moreover, we do not regard this conclusion as precluded by our summary judgment opinion regarding the ECP security changes. We note that ECCI's February 12, 2014 claim to the contracting officer for 329 days of delay preceded the contracting officer's April 9, 2014 assessment of liquidated damages, and that the government has represented that the Board possesses jurisdiction to entertain ECCI's claim for remission of liquidated damages.[128]

### III. Defense Base Act (DBA) Insurance Premium Payments

ECCI requests $174,124 for allegedly unpaid Defense Base Act (DBA) insurance premiums.[129] Specifically, ECCI says:

> Throughout performance of the contract, ECCI and subcontractor Garda World paid DBA insurance premiums to Rutherford. Audits of ECCI's and Garda World's advance premium payments determined that ECCI had paid premiums in excess of the premiums actually due in

---

[126] Gov't br. at 33-37.
[127] Gov't br. at 38.
[128] Gov't May 11, 2021 filing at 6.
[129] App. br. at 29.

the amount of $42,162, which was refunded to [the government] instead of ECCI.

Throughout performance of the contract, ECCI was paid $145,415 by [the government], compared to the $277,377 in audited actual premium payments made by ECCI and Garda World. Considering the $277,377 in audited premium payments excludes the $42,162 that had been paid by ECCI but refunded to [the government, the government] has underpaid ECCI $174,124 for DBA insurance premiums.[130]

The government says that we lack jurisdiction to entertain ECCI's DBA claim because, it says, ECCI has not presented that claim to the contracting officer.[131] ECCI points to several pages of its February 12, 2014 claim to the contracting officer that appear to consist of spreadsheets that list costs, including DBA costs.[132] However, ECCI does not quote or even reference any language in that claim that explains to the contracting officer that ECCI has paid DBA premiums in excess of premiums actually due, which excess was refunded to the government instead of to ECCI, and is due to ECCI. Consequently, ECCI's DBA claim is dismissed for lack of jurisdiction. *See* 41 U.S.C. § 7103(a).

## IV. *Constructive Acceleration*

During the hearing, counsel for ECCI described the status of ECCI's acceleration claims:

> The phase [sic] completion originally had damages in the delay claim, [ASBCA No. 59586], I think it was, related to additional management that came from the phase completion acceleration. There is [sic] damages in that one because of that event.
>
> Then the directive cost claim, [ASBCA No. 59643], it has damages associated with the requirement to change HVAC suppliers and air freight in those materials to meet these phase completions. Those two claims still have a phase

---

[130] App. br. at 29 ¶¶ 146-47 (citations omitted).
[131] Gov't br. at 46.
[132] App. reply at 44.

27

completion damage component. [ASBCA No.] 60284 was a claim for phase completion, but it had separate damages related to multiple re-commissioning and mobilizing HVAC testers. That one has been dropped.[133]

Counsel for the government agreed with that explanation.[134] However, we are not bound by the parties' representations; indeed, the Board has an obligation to satisfy itself of its own jurisdiction. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

*A. Jurisdiction*

The government says that we are without jurisdiction to entertain the acceleration claim that ECCI presents to us, because, the government says, that claim has not been presented to the contracting officer.[135] The Board does not possess jurisdiction, within a given appeal, to entertain a claim that is new to the appeal. *Env't Chem. Corp.*, ASBCA No. 58871, 15-1 BCA ¶ 36,110 at 176,286-87. However, rigid adherence to the exact language or structure of the original claim is not required. *Id.* The Board possesses jurisdiction to entertain claims that arise from the same operative facts as those presented to the contracting officer, claim essentially the same relief, and merely assert differing legal theories for that recovery. *Id.* New or modified allegations that do not change the operative facts of the claim to the contracting officer, or change the essential nature of those facts, do not constitute a new claim. *Id.* And an area of costs in addition to those requested of the contracting officer but related to the operative facts of the claim presented to the contracting officer is within our jurisdiction. *See Am. Consulting Servs., Inc.*, ASBCA No. 52923, 00-2 BCA ¶ 31,084 at 153,485; *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 701 (1994).

In its February 12, 2014 claim to the contracting officer (which claim is the predicate for this appeal, ASBCA No. 59586), ECCI presented a constructive acceleration claim that consists of assertions that the government: (1) delayed the 95% and 100% design process; (2) held ECCI to the original schedule; (3) directed extra-contractual work; (4) issued unsatisfactory interim performance ratings; (5) assessed liquidated damages; (6) criticized ECCI for allegedly being late;[136] and (7) "directed

---

[133] Tr. 5/87.
[134] *See* tr. 5/87.
[135] Gov't br. at 43-44.
[136] R4, tab 72 at 9.

the acceleration of the turnover of Building I"[137] and the "phase[d] . . . turnover of facilities."[138] ECCI alleged that those actions "forced ECCI to augment staff to manage the extensive security efforts and additional work,"[139] and that "subsequent to the Government's direction to accelerate and phase the turnover of facilities, ECCI determined it was unable to use the approved Carrier brand [HVAC units] and had to switch to more expensive Aaon and Trane units in order to meet the directed accelerated and phased turnover of facilities."[140]

By comparison, in its *briefing* to the Board in this appeal, ASBCA No. 59586,[141] ECCI sets forth an acceleration claim consisting of the following assertions: (1) "[b]ecause of the late issuance of modifications for time extensions, ECCI accelerated performance, including air freighting Pre-Engineered Buildings and HVAC equipment," and by adding additional management staff,[142] (2) "[i]n early 2013, [the government] . . . directed 'phased completion' and sequenced handover of buildings; this accelerated the project,[143] (3) "ECCI notified the government that [the government's] direction for phased completion had accelerated ECCI's schedule and was a change,"[144] (4) the government directed ECCI to meet accelerated phased completion dates,[145] (5) because of the "direction to accelerate and handover buildings out of sequence," ECCI "switch[ed] HVAC suppliers and airfreight[ed] equipment," and "[m]obiliz[ed] significantly more management staff to focus on priority buildings";[146] and (6) "ECCI provided notice that it was being accelerated, and incurred additional costs to air freight PEBs and add management resources, which were necessary to meet the unreasonably short schedule."[147]

---

[137] R4, tab 72 at 48, 62-63.

[138] R4, tab 72 at 161.

[139] R4, tab 72 at 11.

[140] R4, tab 72 at 45. ECCI went on to say that "[t]his issue will be addressed in a follow-on [Request for Equitable Adjustment] for the construction costs associated with the Government's improper direction to change the requirements of the contract. Only the costs associated with the delays discussed above are included in this REA." *Id.*

[141] ECCI sets forth additional acceleration allegations in ASBCA No. 59643. *See* app. br. at 86-87.

[142] App. br. at 19-20 ¶¶ 81, 87 (citations omitted).

[143] App. br. at 19 ¶ 83 (citations omitted).

[144] App. br. at 19 ¶ 85 (citations omitted.

[145] App. br. at 19 ¶ 86 (citations omitted).

[146] App. br. at 19 ¶ 87 (citations omitted).

[147] App. br. at 64. We understand the term "PEB" to refer to "Pre-Engineered Building."

Distilling the assertions recited above, we conclude that the constructive acceleration claim set forth in ECCI's February 12, 2014 claim and its post-hearing briefing share the following same set of operative facts: that the government directed the phased turnover, handover, or completion of the buildings to be constructed, causing ECCI to increase management staff and purchase alternative air conditioning equipment.[148] Because, except for this "phased handover" element, the two claims are not based upon the same set of operative facts, we possess jurisdiction in this appeal to entertain only the phased handover claim. Consequently, all but the phased handover claim—the remainder having to do with an alleged government-directed requirement to use UL-listed refrigerant—is dismissed for lack of jurisdiction. We further conclude that ECCI's specific requests here for compensation for having air-freighted HVAC equipment and PEBs are related to the operative facts of the constructive acceleration claim presented to the contracting officer, and so are within our jurisdiction.[149]

*B. Merits*

Regarding the merits of ECCI's phased-turnover constructive acceleration claim,[150] constructive acceleration often occurs when the government demands compliance with an original contract deadline, despite excusable delay by the contractor: a contractor must prove that: (1) the contractor encountered a delay that is excusable under the contract; (2) the contractor made a timely and sufficient request for an extension of the contract schedule; (3) the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) the contractor was required to expend extra resources to compensate for the lost time and remain on schedule. *IAP Worldwide Servs., Inc.*, ASBCA Nos. 59397, et al., 17-1

---

[148] The government does not, in reliance upon the February 24, 2020 dismissal of ASBCA No. 60284 with prejudice, assert any affirmative defense to ECCI's assertion in this appeal of a phased-turnover acceleration claim.

[149] We note that in its May 2, 2014 claim to the contracting officer and in ASBCA No. 59643, ECCI also seeks the cost of airfreighting HVAC units. *See* app. br. at 82 ¶ 256; R4, tab 75 at 7.

[150] App. br. at 62-64; gov't br. at 44-45, 118.

BCA ¶ 36,763 at 179,158. The government apparently contests only the fourth and fifth of those elements, effectively conceding the first three.[151]

### 1. Air-Freighting PEBs

Presumably regarding whether ECCI was required to expend extra resources to compensate for the lost time and remain on schedule, and specifically concerning the air-freighting of PEBS, the government points the finger at ECCI, saying that ECCI's subcontractor did not order the PEB buildings "in a timely manner, left the site in November 2011, and was terminated by ECCI in December 2011."[152] ECCI does not address that contention.[153] On September 4, 2011, ECCI informed its subcontractor, Folad Masih Co. (FMC), that ECCI was concerned with FMC's progress regarding Pre-Engineered Buildings (PEBs).[154] On October 4, 2011, ECCI wrote again to FMC of ECCI's concerns with FMC's progress.[155] On November 27, 2011, ECCI informed FMC that PEBs would be "removed and terminated" from FMC's subcontract.[156] On December 10, 2011, ECCI terminated FMC's contract, stating that "FMC[']s lack of performance to date on the awarded contract has prevented ECCI from competing the associated tasks that were awarded and has significantly delayed the project activities that are required to complete the project in a timely manner."[157] ECCI does not, in this appeal, address FMC's performance; consequently, we are not persuaded that government constructive acceleration was responsible for ECCI air freighting PEBS to Afghanistan, and we deny this component of ECCI's constructive acceleration claim.

### 2. Air-Freighting HVAC Equipment

With respect to ECCI's claim that government-caused constructive acceleration required ECCI to air-freight HVAC equipment, ECCI's post-hearing briefing does not identify any amount for that claim. The government points us to an ECCI spreadsheet presented during the hearing,[158] which lists $372,796 for "air shipment," but identifies that amount as for "Airshipment of PEB."[159] ECCI having failed to identify a specific

---

[151] *See* gov't br. at 42.
[152] Gov't br. at 42 ¶ 51.
[153] App. br. at 41-43.
[154] R4, tab 164 at 1.
[155] R4, tab 945.
[156] R4, tab 947 at 1.
[157] R4, tab 948.
[158] Gov't br. at 2, 42 ¶ 49; tr. 1/290; *see* app. supp. R4, tab 305.
[159] App. supp. R4, tab 305.

dollar amount for air-freighting HVAC equipment, that claim is denied. *See ESCgov, Inc.*, ASBCA Nos. 61358 *et al.*, 17-1 BCA ¶ 36,772 at 179,189.

CONCLUSION

We have considered the parties' other arguments and find them unnecessary to address. We dismiss for lack of jurisdiction ECCI's claims for additional compensation for (1) allegedly unpaid Defense Base Act (DBA) insurance payments, and (2) the claim that an alleged government-directed requirement to use UL-listed refrigerant constructively accelerated contact performance. The appeal is otherwise sustained in part and denied in part: ECCI is awarded $278,339.81, plus interest in accordance with 41 U.S.C. § 7109, from February 12, 2014, the putative date that the contracting officer received ECCI's claim, until the date of payment.

Dated: April 18, 2025

TIMOTHY P. McILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59586, Appeal of ECC International Constructors, LLC, rendered in conformance with the Board's Charter.

Dated: April 18, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals